Slip Op. 11-18

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **UNION STEEL**, <br><br> Plaintiff, <br><br> and <br><br> **WHIRLPOOL CORPORATION**, <br><br> Plaintiff-Intervenor, <br><br> v. <br><br> **UNITED STATES**, <br><br> Defendant, <br><br> and <br><br> **UNITED STATES STEEL CORPORATION and NUCOR CORPORATION**, <br><br> Defendant-Intervenors. | **Before: Timothy C. Stanceu, Judge** <br><br> **Court No. 09-00130** |

## OPINION AND ORDER

[Affirming in part, and remanding in part, final determination of the U.S. Department of Commerce issued in an administrative review of an antidumping duty order]

Dated: February 15, 2011

*Troutman Sanders LLP* (*Donald B. Cameron*, *Julie C. Mendoza*, *R. Will Planert*, *Brady W. Mills*, and *Mary S. Hodgins*) for plaintiff.

*Drinker Biddle & Reath, LLP* (*William R. Rucker*) for plaintiff-intervenor.

*Tony West*, Assistant Attorney General, *Jeanne E. Davidson*, Director, *Patricia M. McCarthy*, Assistant Director, *Barbara S. Williams*, Attorney in Charge, International Trade Field Office, Commercial Litigation Branch, Civil Division, United States Department of Justice (*Claudia Burke* and *L. Misha Preheim*); *Daniel J. Calhoun*, Office of Chief Counsel for Import Administration, United States Department of Commerce, of counsel, for defendant.

*Skadden, Arps, Slate, Meagher & Flom LLP* (*Jeffrey D. Gerrish*, *Ellen J. Schneider*, *Soo-Mi Rhee*, and *Robert E. Lighthizer*) for defendant-intervenor United States Steel Corporation.

*Wiley Rein LLP* (*Timothy C. Brightbill*, *Robert E. DeFrancesco, III*, and *Alan H. Price*) for defendant-intervenor Nucor Corporation.

Stanceu, Judge: Plaintiff Union Steel Manufacturing Co., Ltd. ("Union") contests a final determination ("Final Results") issued by the International Trade Administration, U.S. Department of Commerce ("Commerce" or the "Department"), that concluded the Department's fourteenth periodic administrative review of an antidumping duty order on imports of certain corrosion-resistant carbon steel flat products ("CORE") from the Republic of Korea ("Korea"). *Certain Corrosion-Resistant Carbon Steel Flat Products from the Republic of Korea: Notice of Final Results of the Fourteenth Admin. Review & Partial Rescission*, 74 Fed. Reg. 11,082 (Mar. 16, 2009) ("*Final Results*"). Union, a Korean company that produced and exported CORE subject to the order and was a respondent in the review, moves for judgment on the agency record, bringing three claims. Union's first claim "contests Commerce's change of practice regarding the calculation of the general and administrative ('G&A') and interest expense ratios and Commerce's use of Plaintiff's 2007 financial statements to calculate these ratios." Compl. ¶ 7. In its second claim, Union challenges Commerce's "model match" methodology as applied in the review, by which Commerce compared Union's U.S. sales of painted CORE products to Union's home market sales, which included not only painted CORE products but also "laminated" CORE products, *i.e.*, CORE products that are coated with a plastic film. *Id.* ¶ 6. Union argues that Commerce erred in treating its laminated CORE as identical to its painted CORE for model match purposes. *Id.* ¶¶ 16-17. Third, plaintiff challenges Commerce's construction of section 771(35) of the Tariff Act of 1930 ("Tariff Act" or the "Act"), 19 U.S.C.

§ 1677(35) (2006), according to which Commerce applied its practice of "zeroing," *i.e.*, the

deeming of the sales a respondent makes in the United States at prices above normal value to

have individual dumping margins of zero rather than negative margins.  Compl. ¶ 5.  Union

claims that as a result of these errors, the weighted-average dumping margin of 7.56% that

Commerce assigned to Union in the Final Results was significantly overstated.  *Id.* ¶¶ 5-7; *Final

Results*, 74 Fed. Reg. at 11,083.

On plaintiff's first claim, the court determines that Commerce acted lawfully in basing its

general and administrative ("G&A") and interest expense ratio calculations on financial

statements that pertained to seven of the twelve months of the one-year period of review

("POR") covered by the Final Results.  On plaintiff's second claim, the court grants, in part,

defendant's request for a voluntary remand allowing Commerce to reconsider its denial, made

during the review, of Union's request for a revised model match methodology that includes an

individual model match type category for laminated CORE products.  On plaintiff's third claim,

the court affirms the Department's use of zeroing in the Final Results based on binding

precedent.

## I. Background

Commerce initiated the fourteenth administrative review of certain corrosion-resistant

carbon steel flat products from Korea in 2007.  *Initiation of Antidumping & Countervailing Duty

Admin. Reviews & Requests for Revocation in Part*, 72 Fed. Reg. 54,428 (Sept. 25, 2007).  On

September 9, 2008, Commerce published preliminary results ("Preliminary Results"), in which

Commerce calculated a preliminary dumping margin of 1.9% for Union.  *Certain Corrosion-

Resistant Carbon Steel Flat Products from the Republic of Korea: Notice of Prelim. Results of*

**Court No. 09-00130**                                                                 **Page 4**

*the Antidumping Duty Admin. Review*, 73 Fed. Reg. 52,267, 52,272 (Sept. 9, 2008) ("*Prelim.*

*Results*").  On March 16, 2009, Commerce published the Final Results, which determined

Union's margin of 7.56%.  *Final Results*, 74 Fed. Reg. at 11,083.

Union commenced this action on March 24, 2009 and filed a motion for a preliminary

injunction against liquidation of certain entries, which the court granted on March 25, 2009.

Summons; Compl.; Mot. for Prelim. Inj.; Order, Mar. 25, 2009.  On May 13, 2009, the court

granted the motions of Whirlpool Corporation ("Whirlpool"), a U.S. importer of subject

merchandise, to intervene as of right and to obtain a preliminary injunction against liquidation of

Whirlpool's entries.  Order, May 13, 2009; *see Union Steel v. United States*, 33 CIT __, Slip Op.

09-47 (May 19, 2009).  On July 2, 2009, Union filed its motion for judgment on the agency

record.  Pl. Union Steel's Mot. for J. upon the Agency R.  On October 21, 2009, defendant and

defendant-intervenors, Nucor Corporation and United States Steel Corporation, filed their

responses to plaintiff's motion.  Def.'s Resp. to Pl.'s Mot. for J. upon the Agency R.; Nucor

Corp.'s Mem. in Resp. to the Mot. for J. on the Agency R. by Pl. Union Steel ("Nucor's Resp.");

Mem. in Opp'n to Pl.'s Mot. for J. on the Agency R. Filed By Def.-Intervenor United States

Steel Corp ("U.S. Steel's Opp'n").  On November 20, 2009, plaintiff filed its reply brief in

support of its motion.  Reply Br. of Pl. Union Steel ("Union's Reply").

On April 8, 2010, in response to Union's request, the court held oral argument on the

issue of whether Commerce's determination to calculate Union's G&A and interest expense

ratios based on 2007 financial statements is supported by substantial evidence and otherwise in

accordance with law.  Oral Tr. (Apr. 8, 2010).  On May 24, 2010, pursuant to discussion at oral

argument, defendant filed a proposed remand order pertaining to its request for a voluntary

remand in response to plaintiff's claim challenging the Department's model match methodology,

to which defendant-intervenors consent.  Def.'s Proposed Order (May 24, 2010).  Plaintiff and

plaintiff-intervenor did not consent to defendant's proposed remand order.  Def.'s Comments

Regarding Def.'s Proposed Remand Order.

## II. DISCUSSION

The court exercises jurisdiction under section 201 of the Customs Courts Act of 1980,

28 U.S.C. § 1581(c) (2006), pursuant to which the court reviews actions commenced under

section 516A of the Tariff Act, 19 U.S.C. § 1516a, including an action contesting the final

results of an administrative review that Commerce issues under section 751 of the Tariff Act,

19 U.S.C. § 1675(a).  The court will uphold the Department's determination unless it is

unsupported by substantial evidence on the record or otherwise not in accordance with law.  *See*

19 U.S.C. § 1516a(b)(1)(B)(i).

### A.  Commerce Did Not Err in Calculating General & Administrative and Interest Expenses Using 2007 Financial Statements

Union argues that Commerce was required to calculate G&A and interest expenses using

the financial statements for Union and its parent company, Dongkuk Steel Mill ("DSM"), for

fiscal year 2006 rather than the statements for fiscal year 2007.  Br. in Supp. of the Mot. of Pl.

Union Steel for J. upon the Agency R. 14-28 ("Pl.'s Br.").  The court concludes that this claim is

without merit.

In a review, Commerce ordinarily calculates the normal value of the subject merchandise

as an average of prices in comparison-market sales of the foreign like product during each

calendar month in which a respondent made U.S. sales.  19 C.F.R. § 351.414(b)(3) (2007)

(describing the "average-to-transaction method" of comparing home market and U.S. sales) &

§ (c)(2) (stating that Commerce normally will use the average-to-transaction method in a review).  Normal value excludes, in certain circumstances, sales made at prices below the cost of production ("COP") of the foreign like product.  Tariff Act, § 773(b)(1), 19 U.S.C. § 1677b(b)(1).[1]  COP includes, among others things, an amount for G&A expenses.  *Id.* § 1677b(b)(3).[2]  As is its practice, Commerce decided to include in COP interest expenses, *i.e.*, financing costs, a decision not challenged here.

---

[1] Specifically, section 773(b)(1) of the Tariff Act of 1930 (the "Act") provides, in pertinent part, that:

> Whenever the administering authority has reasonable grounds to believe or suspect that sales of the foreign like product under consideration for the determination of normal value have been made at prices which represent less than the cost of production of that product, the administering authority shall determine whether, in fact, such sales were made at less than the cost of production.  If the administering authority determines that sales made at less than the cost of production–
>> (A) have been made within an extended period of time in substantial quantities, and
>> (B) were not at prices which permit recovery of all costs within a reasonable period of time,
> such sales may be disregarded in the determination of normal value.

19 U.S.C. § 1677b(b)(1) (2006).

[2] Section 773(b)(3) of the Act, provides that the "cost of production" of the foreign like product is the sum of:

> (A) the cost of materials and of fabrication or other processing of any kind employed in producing the foreign like product, during a period which would ordinarily permit the production of that foreign like product in the ordinary course of business;
> (B) an amount for selling, general, and administrative expenses based on actual data pertaining to production and sales of the foreign like product by the exporter in question; and
> (C) the cost of all containers and coverings of whatever nature, and all other expenses incidental to placing the foreign like product in condition packed ready for shipment.

19 U.S.C. § 1677b(b)(3).

To calculate G&A and interest expenses for a particular product, Commerce first calculates ratios for G&A and interest.  The numerator of the G&A ratio is the respondent's full-year G&A expenses, and the numerator for the interest ratio is the respondent's full-year interest expenses.  *See Letter from Program Manager Office of AD/CVD Operations 3 to Dongbu* 101-38, at 13-14 (Dec. 6, 2007) (Admin. R. Doc. No. 4454) ("*Section D Questionnaire*").  The denominator for both ratios is the respondent's full-year cost of goods sold.  *Id.*  Commerce uses as numerator and denominator the relevant data from the respondent's financial statements.  *Id.*  Commerce then uses these ratios to calculate per-unit G&A and interest by multiplying each ratio by the total cost to manufacture the particular foreign like product for which Commerce is calculating COP.  *Id.*  At issue in this case is whether Commerce acted lawfully in choosing to calculate the G&A and interest ratios using data from Union's and DSM's 2007 financial statements.

To acquire the information needed to calculate G&A and interest expense ratios, Commerce requested on December 6, 2007 that Union provide data from financial statements.  *See id.* at 13; *Letter from Program Manager Office of AD/CVD Operations 3 to Union* (Dec. 6, 2007) (Admin. R. Doc. No. 4457).  Commerce instructed Union to "use the full-year G&A expense and COGS [cost of goods sold] reported in your company's audited fiscal year financial statements that most closely correspond to the POI."  *Section D Questionnaire* 13.  Commerce provided similar instructions for interest expenses.  *Id.* at 14-15.  Although the period to which the financial statements were to "most closely correspond" was August 1, 2006 through July 31, 2007, *Final Results*, 74 Fed. Reg. at 11,082, Union responded by providing financial statements for fiscal year 2006, for the apparent reason that the financial statements for 2007 were not

available at the time of submitting the questionnaire response.[3]  *Letter from Union to the Sec'y of Commerce* 356-681, exhibit D-16 & 17 (Feb. 4, 2008) (Admin. R. Doc. No. 4530) ("*Union's Section D Resp.*").  Later, on June 9, 2008, Commerce requested fiscal year 2007 financial statements, which Union provided.  *Letter from Union to the Sec'y of Commerce* 1, exhibits D-39 & D-40 (July 16, 2008) (Admin. R. Doc. No. 4675) ("*Union's Supplemental Resp.*").

In the Preliminary Results, Commerce determined Union's G&A and interest expense ratios using the 2006 financial statements.  *Prelim. Results*, 73 Fed. Reg. at 52,271-72.  In the Final Results, Commerce used, instead, the 2007 financial statements.  *Final Results*, 74 Fed. Reg. at 11,083.  Commerce explained its change in position in an Issues and Decisions Memorandum ("Decision Memorandum"), which Commerce incorporated by reference in the Final Results.  Issues & Decision Mem., A-580-816, ARP 3-09, at 14-15 (Mar. 9, 2009) (Admin. R. Doc. No. 4868) ("*Decision Mem.*"); *Final Results*, 74 Fed. Reg. at 11,083.  The Decision Memorandum explained that the "2007 fiscal year financial statements overlap seven months of the POR whereas the 2006 financial statements overlap only five months of the POR" and that "[t]herefore, the 2007 financial statements are the more appropriate basis for the G&A expense and interest expense ratios since the portion of the POR in 2007 is longer than the portion of the POR in 2006." *Decision Mem.* 15.  As additional reasons for its decision to use the 2007 financial statements, the Department stated that its questionnaire "requires the respondent to use

---

[3] Specifically, Union Manufacturing Co., Ltd. ("Union") used its own 2006 unconsolidated financial statements to calculate its general & administrative ("G&A") expense ratio and used the 2006 consolidated financial statements for Union's parent company, Dongkuk Steel Mill, to calculate its interest expense ratio.  *Letter from Union to the Sec'y of Commerce* 356-681, exhibits D-16 & D-17 (Feb. 4, 2008) (Admin. R. Doc. No. 4530) ("*Union's Section D Resp.*").

the audited fiscal year financial statements for the period that most closely corresponds to the

POR," and that "[b]asing the G&A and interest expense rates on the fiscal year which most

closely corresponds to the POR is also our practice." *Id.* at 14.

The Department also stated that "[w]e acknowledge that, for at least the three previous

reviews of this particular case, the Department has accepted . . . Union's reporting based on the

earlier set of the financial statements for its calculations of G&A expense and interest expense

ratios." *Id*. at 15.  The Department concluded that "it is not compelled to continue with a

methodology at variance with its standard practice for the sake of consistency with prior

segments." *Id.*  The Department's description of which financial statements it used in the three

prior reviews is apparently incorrect.  Plaintiff has conceded that Commerce accepted Union's

financial statements pertaining to five months of the POR in only one prior instance, which was

the previous administrative review.  Union's Reply 3 n.2.

The statute does not speak to the issue presented by the choice of financial statements in

this case, and accordingly the court accords the Department considerable deference when

reviewing Commerce's decision.  *See Pesquera Mares Australes Ltda. v. United States*, 266 F.3d

1372, 1382 (Fed. Cir. 2001).  The court concludes that Commerce acted reasonably in choosing

the 2007 financial statements over the 2006 statements based on the relatively greater

correspondence with the POR.

Union's arguments to the contrary are not persuasive.  According to Union, Commerce

should have used 2006 financial statements because "the more relevant period is the home

market sales reporting period, which . . . includes sales made between March 2006 and

September 2007" and "the majority of this period–ten months out of nineteen–falls *in 2006* . . . ."

Pl.'s Br. 19.  In referring to the nineteen-month "home market sales reporting period," Union

refers to reporting of home market sales occurring three months prior to the earliest sale of

subject merchandise and two months subsequent to the latest sale of subject merchandise.  *Id.*

at 19; *see* 19 C.F.R. § 351.414(e).  The record indicates that Union reported home market sales

that took place as early as March 2006 and as late as September 2007.  *Letter from Union to the*

*Sec'y of Commerce* exhibit B-2 (Feb. 4, 2008) (Admin. R. Doc. No. 4530); Pl.'s Br. 19 (referring

to the sales as "window period sales").

        Even if ten of the nineteen months of the home market sales reporting period were in

2006, Commerce would not be acting unreasonably in placing more weight on the

correspondence of the financial statement reporting period to the POR, as opposed to

correspondence to the entire home market sales reporting period.  It is reasonable for Commerce

to consider the home market sales reporting period to be less significant than the POR because

the earliest three months, and latest two months, of reported home market sales are used in the

margin calculation only if a respondent had no sales of the foreign like product during the same

month of the POR in which it sold subject merchandise.[4]  *See* 19 C.F.R. § 351.414(e)(2)

(defining the "contemporaneous month" during which a weighed average based on home market

---

[4] Moreover, the court has reason to question whether the data Union presents in its brief support Union's argument.  Although those data show that Union reported ten months of home market sales for 2006, the data also appear to indicate that the International Trade Administration, U.S. Department of Commerce ("Commerce" or the "Department") was required to compare U.S. sales to a weighted average price determined from only nine of those months.  *See* Br. in Supp. of the Mot. of Pl. Union Steel for J. upon the Agency R. appendix 1 ("Pl.'s Br.").  Thus, it appears possible to conclude from the data submitted with plaintiff's brief that nine months of the relevant home market sales reporting period fell within each of the two calendar years.

sales will be compared to a U.S. sale of subject merchandise as, in the first instance, the month

during which the U.S. sale was made).

Union argues, further, that it was unreasonable for Commerce to calculate Union's G&A

and interest expense ratios "using data that is impacted by events occurring *after* the POR and

which Union could not possibly factor into its decision-making when setting its home market

prices." Pl.'s Br. 21. This argument is also unpersuasive. The "event" to which Union refers is

a "2007 year-end adjustment for foreign currency translation gains and losses," *id.*, which

necessarily took place after the POR ended on July 31, 2007. Although Union may have a

legitimate interest in being able to predict how Commerce will apply the Tariff Act to its sales

and set prices accordingly, that interest, in the entire circumstances of this case, is not sufficient

to compel Commerce to use the 2006 financial statements. Commerce conducts administrative

reviews according to a "'retrospective' assessment system." 19 C.F.R. § 351.213(a). Some

uncertainty is inherent in such a system.

Union also argues that Commerce has a "practice" of accepting Union's financial

statements pertaining to five months of the period of review and that Union has relied upon this

practice. Pl.'s Br. 25-26 ("This consistency in the past reviews has become an 'agency practice'

that Union has come to rely upon for predictability . . . ."). Commerce, however, did not

establish such a practice as to Union. Union concedes as much in its reply brief by informing the

court that only once, *i.e.*, in the most recent review, has Commerce calculated Union's G&A and

interest expenses using financial statements pertaining to five months of the POR.[5]  Union's

Reply 3 n.2.

Union takes issue with the Department's relying in part on a claimed practice of using

financial statements that most closely correspond to the POR, when the Department, according to

Union, has failed to follow such a "practice" on so many occasions that the practice cannot be

said to exist.  Pl.'s Br. 25 (citing *Ranchers-Cattlemen Action Legal Found. v. United States*,

23 CIT 861, 884-85, 74 F. Supp. 2d 1353, 1374 (1999)).  In the Decision Memorandum,

Commerce cited two previous decisions in which it referred to the claimed practice.  *Decision*

*Mem.* 14 (citing *Magnesium Metal from the Russian Federation: Final Results of Antidumping*

*Duty Admin. Review*, 72 Fed. Reg. 51,791 (Sept. 11, 2007) (incorporating Issues & Decision

Mem., A-821-819, ARP 9-07, cmt. 1 (Sept. 2007), *available at*

http://ia.ita.doc.gov/frn/index.html) & *Certain Stainless Steel Butt-Weld Pipe Fittings from*

*Taiwan: Final Results & Final Rescission in Part of Antidumping Duty Admin. Review*, 67 Fed.

Reg. 78,417 (Dec. 24, 2002) (incorporating Issues & Decision Mem., A-583-816, ARP 12-02,

cmt. 8 (Dec. 17, 2002), *available at* http://ia.ita.doc.gov/frn/index.html)).  Upon reviewing these

decisions and others cited by the parties, the court agrees with Union that the so-called

---

[5] Plaintiff also states, as a related "practice" argument, that in some cases in which "the POR is divided between two fiscal years 'it has been the Department's practice to use the financial statements from the most recently completed fiscal year at the time the questionnaire response was submitted.'"  Pl.'s Br. 25 (citing *Final Determination in the Antidumping Investigation of Light-Walled Rectangular Pipe & Tube from Mexico*, 74 Fed. Reg. 53,677 (Sept. 2, 2004); Issues & Decisions Mem., A-201-832, ARP 9-04, at 64-65 (Sept. 2, 2004), *available at* http://ia.ita.doc.gov/frn/index.html).  The court finds this argument unconvincing: it relies on how Commerce calculated G&A and interest expenses in an investigation in which the period of review was divided evenly between two fiscal years, with six months covered by each. *Id.*

"practice" is subject to exceptions.  What Commerce describes as its practice is at most a

preference for using the financial statement most closely corresponding to the POR, a preference

that Commerce does not observe when it finds sufficient reason to use a different financial

statement or statements.  Nevertheless, Union's objection is to no avail.  On the undisputed facts

of this case, the logic of using the 2007 financial statements based on correspondence with the

POR is sufficient by itself to demonstrate the reasonableness of Commerce's choice to use the

2007 statements, even if the preference, due to inconsistency in application, would not qualify as

an agency practice.

        Union argues in the alternative that Commerce should have calculated G&A and interest

expense ratios by combining the 2006 and 2007 financial statements to "be closer to satisfying

Commerce's legal obligation of allocating costs on a basis that 'reasonably reflects and

accurately captures all of the actual costs incurred in producing and selling the product under

investigation or review.'"  Pl.'s Br. 27-28 (citing *Uruguay Round Agreements Act, Statement of

Administrative Action*, H.R. Doc. No. 103-316, vol. 1, at 835 (1994), *reprinted in* 1994

U.S.C.C.A.N. 4040, 4172).  Under this alternative approach, the G&A and interest expense

ratios would be based on twelve months of data corresponding to the POR and twelve months of

data that pertain to time periods outside the POR.  On the record facts, the alternative approach

does not offer clear advantages over Commerce's approach of using financial statements for the

single year that most closely corresponds to the POR, such that Commerce's approach must be

found unreasonable.  The court rejects, also, Union's argument that Commerce impermissibly

failed to give adequate consideration to this suggested alternative.  *Id*.  The Decision

Memorandum indicated that using the financial statements for two years was "not warranted in

this case." *Decision Mem.* 15.  Although this conclusory statement leaves much to be desired, it

is sufficient when read in the context of the Decision Memorandum as a whole and in view of

the obvious point that, outside of a financial statement with perfect correspondence to the POR,

some compromise in the choice of data always will be necessary.  *See id.* at 14-15.

<u>B.  On Remand, Commerce is Required to Review and Reconsider the Model Match
Methodology it Applied to Union's Sales</u>

An appendix to Commerce's questionnaire specified twelve model match criteria for

CORE, the first of which, termed "type," is at issue in this case.  *Letter from Program Manager*

*Office of AD/CVD Operations 3 to Dongbu* appendix IV (Dec. 6, 2007) (Admin. R. Doc. No.

4454).  The questionnaire directed respondents to classify each of their CORE products within

one of four type categories: (1) "Clad (metals bonded by the hot-rolling process), less than 3/16"

in thickness"; (2) Coated/plated with metal: Painted, or coated with organic silicate,

Polyvinylidene Fluoride ("PVDF"); (3) Coated/plated with metal: Painted, or coated with

organic silicate, All Other (*i.e.*, other than PVDF); and (4) "Not painted, and not coated with

organic silicate."  *Id.*  Union made sales, both in the United States and in its home market,

Korea, of unpainted CORE products, CORE products painted with PVDF, and CORE coated

with other paints.  Pl.'s Br. 6.  Union's home market sales, but not its U.S. sales, also included

sales of CORE that was coated with plastic film.  *Id.*  In responding to Commerce's

questionnaire, Union reported its sales according to the Department's type categories but

proposed an additional type category: "Coated/plated with metal: Laminated with film."  *Letter*

*from Union to the Sec'y of Commerce* 6-126, at 6 (Feb. 4, 2008) (Admin. R. Doc. No. 4530)

("*Union's Section B Resp.*").  Union argued to the Department that its laminated CORE products

were distinguished from its painted CORE because, *inter alia*, they underwent a different

production process, were physically different because they were coated with plastic film, and

were costlier.  *Id.* at 6; *Union's Supplemental Resp.* 23-24.  Rejecting Union's proposed

additional type category, Commerce placed Union's home market sales of laminated CORE

within the type category for "All Other" painted CORE.  *Decision Mem.* 7-8.

      Before the court, Union argues that Commerce erred in placing laminated CORE in the

third type category, for "other painted" products, despite differences in cost, price, commercial

identity, and use.  Pl.'s Br. 28-36.  Union points to record evidence that its laminated products

have physical properties that cannot be achieved by painting, such as the unrestricted expression

of various patterns, superior durability, and the use of environmentally-friendly material.  *Id.*

at 30.  According to Union, Commerce improperly relied on its analysis from previous

administrative reviews to justify grouping within the same type category two distinctly different

classes of products.  *Id.* at 34.

      Defendant proposes a voluntary remand under which Commerce would "review and

reconsider its model match methodology including . . . [r]econsidering the product classification

of laminates and other painted products and addressing all of the parties' arguments regarding

that product classification."  Def.'s Proposed Order (May 24, 2010).  Defendant's proposed

remand also would direct Commerce to consider "the effect of any Court determination

regarding Commerce's remand determination in *Union Steel v. United States*, Ct. Int'l Trade No.

08-00101."  *Id.*  In that remand determination, which the court recently held to be contrary to

law, Commerce decided not to change its model match methodology and thereby rejected

Union's proposal in the thirteenth review to establish a separate model match type-category for

laminated CORE.  *Union Steel v. United States*, 35 CIT __, __, Slip Op. 11-3, at 28-29 (Jan. 11,

2011).  The court concluded that Commerce erred when it determined on the record in the

thirteenth review that laminated CORE and painted, non-laminated CORE could be compared as

merchandise "identical in physical characteristics" according to section 771(16)(A) of the Act,

19 U.S.C. § 1677(16)(A).  *Id.* at __, Slip Op. 11-3, at 28-29.  The court concluded that the record

in that review lacked substantial evidence to support a finding that the physical differences

between laminated and non-laminated, painted CORE were "minor and not commercially

significant."  *Id.* at __, Slip Op. 11-3, at 25.  The court ordered a second remand, under which

Commerce either must reopen the record to re-investigate the issue of whether the physical

differences are minor and not commercially significant or must modify its model match

methodology so that laminated CORE and painted CORE are not compared as identical

merchandise according to 19 U.S.C. § 1677(16)(A).  *Id.* at __, Slip Op. 11-3, at 29.

        In its brief supporting its motion for judgment on the agency record, Union sought a

remand under which the court would order Commerce to place laminated CORE within a

separate type category.  Pl.'s Br. 40.  In its reply brief, Union does not state that it opposes the

government's request for a voluntary remand and takes the position that a remand is appropriate

to allow Commerce to address Union's argument that classifying laminated CORE as painted

CORE is not supported by substantial evidence on the record.  Union's Reply 13-14.  Defendant-

intervenors argue that the Department's model match methodology is supported by substantial

evidence and otherwise consistent with law.  U.S. Steel's Opp'n 26-37; Nucor's Resp. 16-24.

        An agency may request a voluntary remand without confessing error.  *See SKF USA*

*Inc. v. United States*, 254 F.3d 1022, 1027-30 (Fed. Cir. 2001).  The court concludes that it is

appropriate to grant defendant's request for a remand and will issue remand instructions in

essentially the form proposed in defendant's draft order, but updated to reflect the significant

development that has occurred since defendant filed its draft remand order, *i.e.*, the court's

decision in *Union Steel*, 35 CIT at __, Slip Op. 11-3, at 28-29, addressing Union's challenge to

the model match issue presented in the thirteenth review.

        The Decision Memorandum confirms that Commerce, in the fourteenth review, did not

change the model match methodology it applied in the thirteenth review.  *Decision Mem.* 7-8.

Therefore, the court concludes that Commerce again compared laminated CORE with painted,

non-laminated CORE as identical merchandise according to 19 U.S.C. § 1677(16)(A).  As the

court held in *Union Steel*, the Department's doing so is unlawful absent a finding of fact,

supported by record evidence, that laminated CORE and painted, non-laminated CORE are

"identical in physical characteristics" within the meaning of that statutory provision.  *Union

Steel*, 35 CIT at __, Slip Op. 11-3, at 28-29.  The court will issue a remand order consistent with

this holding and defendant's proposal.[6]

### C.  Commerce's Use of Zeroing in the Final Results Was Lawful

        Plaintiff's third claim challenges the method Commerce used to calculate Union's

weighted-average dumping margin.  Compl. ¶¶ 8-15.  To calculate a weighted-average dumping

margin in an administrative review, Commerce first must determine, for each entry of subject

merchandise falling within the period of review, the normal value and the export price (or

_____

        [6] The court's order sets forth a schedule for the remand proceeding parallel to that
ordered in *United States Steel Corporation v. United States*, Consol. Court No. 09-156 (Feb. 15,
2011) ("*US Steel*"), so that the remand redetermination filed pursuant to this Opinion and Order
will take into account any other adjustments to redetermined dumping margins resulting from the
court's remand order in *US Steel*, which pertains to the same administrative review that is the
subject of this litigation.

constructed export price).  19 U.S.C. § 1675(a)(2)(A)(i).  Commerce then determines a margin

for each entry according to the amount by which the normal value exceeds the export price or

constructed export price.  19 U.S.C. §§ 1675(a)(2)(A)(ii), 1677(35)(A); *Decision Mem.* 9-10.  If

the export price or constructed export price on a particular entry is higher than normal value,

Commerce, in calculating a weighted-average margin, assigns a margin of zero to the entry

instead of a negative margin.  *See Decision Mem.* 9-10.  Finally, Commerce aggregates these

individual margins in determining a weighted-average dumping margin.  19 U.S.C.

§ 1677(35)(B).

  Plaintiff argues that Commerce's construction of 19 U.S.C. § 1677(35), pursuant to

which Commerce engaged in zeroing in this administrative review, is unreasonable and therefore

not in accordance with law.  Pl.'s Br. 36-40.  Union acknowledges that the United States Court

of Appeals for the Federal Circuit ("Court of Appeals") and the Court of International Trade

consistently have upheld Commerce's practice of zeroing in administrative reviews.  *Id.*

at 36-37.  Union argues, however, that a determination Commerce issued under section 123 of

the Uruguay Round Agreements Act, 19 U.S.C. § 3533(g) (2006), to implement

recommendations of the World Trade Organization ("WTO") Dispute Settlement Body ("Section

123 Determination") adopted a new interpretation of § 1677(35) that justifies a fresh review of

the zeroing issue by this court.  Compl. ¶¶ 11-15 (citing *Antidumping Proceedings: Calculation

of the Weighted-Average Dumping Margin During an Antidumping Investigation; Final

Modification*, 71 Fed. Reg. 77,722 (Dec. 27, 2006) ("*Section 123 Determination*")).  According

to Union, in issuing the Section 123 Determination that discontinued zeroing in average-to-

average comparisons in antidumping investigations, "Commerce did not explain why it was

appropriate to interpret the statutory provision at issue . . . as having one meaning in the case of

antidumping investigations and a different meaning in administrative reviews." Compl. ¶12.

Union argues that on January 9, 2007, the WTO Appellate Body rejected the use of zeroing in

antidumping administrative reviews on an "as such" basis (citing Appellate Body Report, *United*

*States– Measures Relating to Zeroing in Sunset Reviews*, WT/DS322/AB/R (Jan. 9, 2007)), and

that "[t]o date, however, Commerce has not modified its position, as expressed in the Final

Section 123 Determination[,] that it will continue to interpret the statute as providing for zeroing

in administrative reviews." Compl. ¶ 12, n.2. Union concludes that Commerce's continued use

of zeroing in administrative reviews must be rejected by the court because it "is unsupported by

substantial evidence and is otherwise not in accordance with law." Compl. ¶ 15.

      The Court of International Trade rejected Union's previous challenge to the zeroing

methodology in *Union Steel v. United States*, 33 CIT __, __, 645 F. Supp. 2d 1298, 1305-10

(2009), and must do so again in this case. Union's claim is contrary to precedent of the Court of

Appeals, which consistently has upheld the Department's use of zeroing in administrative

reviews. *SKF USA Inc. v. United States*, No. 2010-1128, 2011 WL 73179, at *8 (Fed. Cir.

Jan. 7, 2011); *Koyo Seiko Co. v. United States*, 551 F.3d 1286, 1290-91 (Fed. Cir. 2008); *NSK*

*Ltd. v. United States*, 510 F.3d 1375, 1379-80 (Fed. Cir. 2007). The Court of Appeals

specifically has affirmed the Department's construing 19 U.S.C. § 1677(35) to allow zeroing in

reviews even though the Department discontinued zeroing in average-to-average comparisons in

investigations. *See SKF USA*, 2011 WL 73179, at *8 ("Even after Commerce changed its policy

with respect to original investigations, we have held that Commerce's application of zeroing to

administrative reviews is not inconsistent with the statute.") (citing *Corus Staal BV v. United*

*States*, 502 F.3d 1370, 1375 (Fed. Cir. 2007)).  The Court of Appeals also has rejected Union's

argument that the zeroing practice conflicts with U.S. obligations under the Agreement on the

Implementation of Article VI of the General Agreement on Tariffs and Trade 1994, Apr. 15,

1994, Marrakesh Agreement Establishing the World Trade Organization, Annex 1A, 1868

U.N.T.S. 201 (1994), concluding that "WTO decisions do not change United States law unless

implemented pursuant to an express statutory scheme."  *SKF USA*, 2011 WL 73179, at *8 (citing

*NSK Ltd.*, 510 F.3d at 1379-80; *Corus Staal BV v. Dep't of Commerce*, 395 F.3d 1343, 1349

(Fed. Cir. 2005)).  Union admits in its complaint that the United States has not implemented

WTO decisions disallowing the zeroing practice in administrative reviews.  Compl. ¶ 12 n.2.

 For these various reasons, the court upholds the Department's use of zeroing in the

administrative review.

### III.  CONCLUSION AND ORDER

 The court concludes that Commerce's calculation of Union's G&A and interest expense

ratios was lawful.  Further, the court concludes that remand is appropriate with respect to the

model match issue and that it would be appropriate to grant defendant's request for voluntary

remand in the circumstances of this case.  Finally, the court concludes that the Final Results must

be affirmed with respect to the Department's use of zeroing based on binding Court of Appeals

precedent.  Therefore, upon consideration of all proceedings and submissions herein, and upon

due deliberation, it is hereby

 **ORDERED** that plaintiff's Motion for Judgment upon the Agency Record, be, and
hereby is, GRANTED only to the extent that a remand is hereby ordered under which Commerce
is directed to review and reconsider its model match methodology and DENIED to the extent
that such motion requested the court to set aside the manner by which Commerce calculated
general, administrative, and interest expenses and Commerce's decision to determine dumping
margins using the zeroing methodology in *Certain Corrosion-Resistant Carbon Steel Flat*

*Products from the Republic of Korea: Notice of Final Results of the Fourteenth Admin. Review & Partial Rescission*, 74 Fed. Reg. 11,082 (Mar. 16, 2009) ("Final Results"); it is further

**ORDERED** that Commerce, upon remand, shall review and reconsider its "model match" methodology, including its decision in the Final Results to deny the request of Union Steel Manufacturing Co., Ltd. ("Union") for a revision of that model match methodology, by which Commerce compared the types of subject merchandise in plaintiff's U.S. sales with the types of foreign like products in plaintiff's sales in its home market; it is further

**ORDERED** that the Department may reopen the record to investigate whether only minor and commercially insignificant physical differences distinguish Union's laminated products from the non-laminated products to which the Department compared Union's laminated products; it is further

**ORDERED** that if substantial record evidence does not support a finding that only minor and commercially insignificant physical differences distinguish Union's laminated products from the non-laminated products to which the Department compared Union's laminated products, then the Department must alter the model match methodology that was applied in the Final Results so that laminated and non-laminated CORE products are not compared according to 19 U.S.C. § 1677(16)(A) and recalculate any affected dumping margins; it is further

**ORDERED** that the Department's remand results must comply with this Opinion and Order, be supported by substantial record evidence, be supported by adequate reasoning, and be in all respects in accordance with law; and it is further

**ORDERED** that the Department shall have ninety (90) days from the date of this Opinion and Order to file its remand results, that plaintiff, plaintiff-intervenor, and defendant-intervenors shall have thirty (30) days from the filing of those results to file comments thereon with the court, and that defendant shall have fifteen (15) days thereafter to file any reply to such comments.

 /s/ Timothy C. Stanceu
Timothy C. Stanceu
Judge

Dated: February 15, 2011
         New York, New York