**Slip Op. 12- 56**

## UNITED STATES COURT OF INTERNATIONAL TRADE

| |
|---|
| **UNION STEEL**, <br><br> Plaintiff, <br><br> and <br><br> **WHIRLPOOL CORPORATION**, <br><br> Plaintiff-Intervenor, <br><br> v. <br><br> **UNITED STATES**, <br><br> Defendant, <br><br> and <br><br> **UNITED STATES STEEL CORPORATION and NUCOR CORPORATION**, <br><br> Defendant-Intervenors. |

**Before: Timothy C. Stanceu, Judge**

**Court No. 09-00130**

## OPINION AND ORDER

[Affirming agency decision on model-match methodology, reconsidering a prior decision of the court, and ordering a second remand, in action contesting final results of an administrative review of an antidumping duty order]

Dated: April 25, 2012

*Donald B. Cameron*, *Julie C. Mendoza*, *R. Will Planert*, *Brady W. Mills*, and *Mary S. Hodgins*, Morris, Manning & Martin, LLP, of Washington, DC, for plaintiff.

*William R. Rucker* and *Nicolas Guzman*, Drinker Biddle & Reath, LLP, of Chicago, IL, for plaintiff-intervenor.

*Tara K. Hogan*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for defendant. With her on the brief were *Tony West*, Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Claudia Burke*, Assistant Director. Of counsel on the brief was *Daniel J. Calhoun*, Attorney, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, of Washington, DC.

*Jeffrey D. Gerrish*, *Ellen J. Schneider*, and *Robert E. Lighthizer*, Skadden, Arps, Slate, Meagher & Flom LLP, of Washington, DC, for defendant-intervenor United States Steel Corporation.

*Timothy C. Brightbill* and *Alan H. Price*, Wiley Rein LLP, of Washington, DC, for defendant-intervenor Nucor Corporation.

Stanceu, Judge: Plaintiff Union Steel Manufacturing Co., Ltd. ("Union") brought this action in 2009 to contest the final determination ("Final Results") issued by the International Trade Administration, U.S. Department of Commerce ("Commerce" or the "Department"), that concluded the Department's fourteenth periodic administrative review of an antidumping duty order on imports of certain corrosion-resistant carbon steel flat products ("CORE") from the Republic of Korea ("Korea").  Compl. (Mar. 24, 2009), ECF No. 5; *Certain Corrosion-Resistant Carbon Steel Flat Products from the Republic of Korea: Notice of Final Results of the Fourteenth Admin. Review & Partial Rescission*, 74 Fed. Reg. 11,082 (Mar. 16, 2009) ("*Final Results*").  The Final Results assigned Union, a Korean producer and exporter of CORE subject to the order, a weighted-average dumping margin of 7.56%.  *Final Results*, 74 Fed. Reg. at 11,083.

In its first opinion and order in this case, *Union Steel v. United States*, 33 CIT __, Slip Op. 09-47 (May 19, 2009) ("*Union Steel I*"), the court ruled that Whirlpool Corporation had plaintiff-intervenor status as of right and enjoined the liquidation of entries of Whirlpool's merchandise pending judicial review.  In its second opinion and order, *Union Steel v. United States*, 35 CIT __, 755 F. Supp. 2d 1304 (2011) ("*Union Steel II*"), the court held that Commerce acted lawfully in basing Union's general and administrative ("G&A") expenses and interest expense on financial statements that pertained to seven of the twelve months of the period of review and in using the "zeroing" methodology in determining Union's weighted-average

dumping margin for the Final Results. *Id.* at __, 755 F. Supp. 2d at 1315-16.  Further, in response to defendant's request for a voluntary remand, the court ordered that Commerce reconsider its denial of Union's request for a revision to the model-match methodology Commerce applied in the fourteenth review.  *Id.* at __, 755 F. Supp. 2d at 1315-16.

Before the court is the determination ("Remand Redetermination") Commerce issued in response to the remand order in *Union Steel II*.  *Final Results of Redetermination Pursuant to Remand* (July 15, 2011), ECF No. 115 ("*Remand Redetermination*").  In the Remand Redetermination, Commerce altered its model-match methodology with respect to the treatment of "laminated" CORE, which is CORE that is coated with a plastic film.  In the Final Results, Commerce considered laminated CORE products to be products identical in physical characteristics with subject CORE that was painted but not laminated.  Under the altered methodology, Commerce no longer compared subject non-laminated, painted CORE products with laminated CORE products as products identical in physical characteristics.  *Id.* at 2.  The Remand Redetermination lowered Union's weighted-average dumping margin from 7.56% to 7.45%.  *Id.* at 18.

Also before the court is Union's motion requesting that the court reconsider its decision in *Union Steel II* affirming the Department's use of zeroing in the fourteenth administrative review.  Union bases its motion for reconsideration on an intervening judicial decision, *Dongbu Steel Co. v. United States*, 635 F.3d 1363 (Fed. Cir. 2011) ("*Dongbu*"), in which the U.S. Court of Appeals for the Federal Circuit ("Court of Appeals") declined to affirm a judgment of the Court of International Trade sustaining the Department's use of zeroing in an administrative review of an antidumping duty order.

The court affirms the Department's decision on remand to apply a revised model-match methodology, which plaintiff supports and defendant-intervenors oppose.  The court issues a second remand order so that Commerce may provide an explanation of its decision to apply zeroing that addresses the issues identified by the Court of Appeals in *Dongbu*.

## I. BACKGROUND

Background on this litigation is set forth in the court's prior opinions and orders and supplemented herein.  *Union Steel I*, 33 CIT at __, Slip Op. 09-47, at 3-7; *Union Steel II*, 35 CIT at __, 755 F. Supp. 2d at 1306-07.

Union brought three claims in this action.  In Count I of its complaint, plaintiff challenged the Department's construction of section 771(35) of the Tariff Act of 1930 ("Tariff Act"), 19 U.S.C. § 1677(35) (2006), according to which the Department applied its practice of "zeroing," *i.e.*, the deeming of the sales a respondent makes in the United States at prices above normal value to have individual dumping margins of zero rather than negative margins.  Compl. ¶¶ 8-15.  In Count II, Union challenged the Department's "model match" methodology as applied in the fourteenth review, claiming that Commerce unlawfully compared Union's U.S. sales of non-laminated, painted CORE products to Union's home market sales of both painted CORE products and laminated CORE products.  *Id.* ¶¶ 16-17.  In Count III, Union challenged the Department's decisions to use Union's 2007 financial statement, prepared for a fiscal year corresponding to the 2007 calendar year, to determine a G&A expense ratio and the decision to use the fiscal-year 2007 financial statement (also based on the calendar year) of Union's parent, Dongkuk Steel Mill ("DSM"), to determine Union's interest expense ratio.  *Id.* ¶¶ 18-19.  Union claimed that Commerce should have used the fiscal-year 2006 statements and that, in failing to

do so, impermissibly departed from its practice, established during previous reviews of Union, of

calculating Union's G&A expense and interest expense ratios using financial statements

applying to the first, five-month portion of the POR (August through December) rather than

financial statements pertaining to the second, seven-month portion of the POR (January through

July).  *Id.*

     Addressing Count I of the complaint, the court in *Union Steel II* sustained the

Department's use of the zeroing methodology in determining Union's weighted-average

dumping margin in the fourteenth review.  *Union Steel II*, 35 CIT at __, 755 F. Supp. 2d

at 1314-15.  Responding to defendant's request for a voluntary remand on the claim in Count II,

the court ordered Commerce to "review and reconsider its 'model match' methodology" and

alter that methodology "if substantial record evidence does not support a finding that only minor

and commercially insignificant physical differences distinguish Union's laminated products from

the non-laminated products to which the Department compared Union's laminated products."  *Id.*

at __, 755 F. Supp. 2d at 1316.  With respect to the claim in Count III, the court sustained the

Department's decisions to use the 2007, rather than the 2006, financial statements.  *Id.* at __,

755 F. Supp. 2d at 1307-12.

     Plaintiff filed its motion for reconsideration on April 5, 2011, relying on the decision of

the Court of Appeals in *Dongbu*.  Pl. Union Steel's Mot. for Reconsideration (April 5, 2011),

ECF No. 106.  On May 9, 2011, defendant and defendant-intervenors Nucor Corporation

("Nucor") and United States Steel Corporation ("U.S. Steel") opposed this motion.  Def.'s Resp.

in Opp'n to Pl. Union Steel's Mot. for Reconsideration (May 9, 2011), ECF No. 114 ("Def.'s

Opp'n"); Def.-Intervenor's Opp'n to Union Steel's Mot. for Reconsideration (May 9, 2011),

ECF No. 112 ("Nucor's Opp'n"); Mem. of Def.-Intervenor United States Steel Corporation in

Opp'n to Pl. Union Steel's Mot. for Reconsideration (May 9, 2011), ECF No. 113 ("U.S. Steel's

Opp'n").

      Commerce filed the Remand Redetermination on July 15, 2011.  *Remand*

*Redetermination*.  Plaintiff commented in support of the Remand Redetermination on August 15,

2011.  Pl. Union Steel's Comments on the U.S. Department of Commerce's July 15, 2011 Final

Results of Redetermination Pursuant to Ct. Remand (Aug. 15, 2011), ECF No. 120.  On the same

day, defendant-intervenors filed comments opposing the Remand Redetermination.  Comments

on Final Results of Redetermination Pursuant to Ct. Order (Aug. 15, 2011), ECF No. 118

("Nucor's Comments"); United States Steel Corporation's Comments on the Final Results of

Redetermination Pursuant to Remand Issued by the Department of Commerce (Aug. 15, 2011),

ECF No. 119 ("U.S. Steel's Comments").  On August 26, 2011, defendant replied to the

comments of defendant-intervenors.  Def.'s Resp. to Def.-Intervenors' Comments on the

Department of Commerce's Remand Results (Aug. 26, 2011), ECF No. 123.

      Finally, on February 15, 2012, Union notified the court of a notice published by

Commerce indicating that going forward Commerce no longer will employ the zeroing

methodology in administrative reviews of antidumping duty orders.  Notice of Supplemental

Authority (Feb. 15, 2012), ECF No. 129 (citing *Antidumping Proceedings: Calculation of the*

*Weighted-Average Dumping Margin & Assessment Rate in Certain Antidumping Duty*

*Proceedings; Final Modification*, 77 Fed. Reg. 8,101 (Feb. 14, 2012)).  Defendant moved for

leave to reply to this notification on March 6, 2012.  Def.'s Mot. for Leave to File Resp. to Pl.'s

Notice of Supplemental Authority (Mar. 6, 2012), ECF No. 130.

## II. DISCUSSION

The court exercises jurisdiction under section 201 of the Customs Courts Act of 1980, 28 U.S.C. § 1581(c) (2006), pursuant to which the court reviews actions commenced under section 516A of the Tariff Act, 19 U.S.C. § 1516a, including an action contesting the final results of an administrative review that Commerce issues under section 751 of the Tariff Act, 19 U.S.C. § 1675(a).  The court "shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law . . . ."  19 U.S.C. § 1516a(b)(1)(B)(i).

The Remand Redetermination altered the model-match methodology as applied in the fourteenth review so that U.S. sales of Union's painted CORE products are no longer compared with home-market sales of products in a category including both painted CORE products and products that were laminated with plastic.  In the Remand Redetermination, Commerce also "adjusted the cost of production to account for purchases of steel substrate from affiliated parties in Union's margin calculation," citing a remand redetermination Commerce prepared in another case.  *Remand Redetermination* 2 (citing *United States Steel Corp. v. United States*, 35 CIT __, 759 F. Supp. 2d 1349 (2011) ("*US Steel*")).  The court previously ordered that Commerce, in preparing the remand redetermination at issue in this case, "take into account any other adjustments to redetermined dumping margins resulting from the court's remand order in *US Steel*, which pertains to the same administrative review that is the subject of this litigation." *Union Steel II*, 35 CIT at __, 755 F. Supp. 2d at 1314 n.6.  The court now has affirmed the Department's decisions set forth in the remand redetermination responding to the court's order in *US Steel.  United States Steel Corp. v. United States*, 36 CIT __, Slip Op. 12-55 (April 25, 2012).

 A.  The Remand Redetermination Lawfully Determined that the Non-Laminated, Painted CORE
May Not Be Compared to the Laminated Core as Products "Identical in Physical Characteristics"

         In an administrative review, Commerce determines, for each entry of the subject

merchandise, the normal value, the export price or constructed export price, and the dumping

margin.  19 U.S.C. § 1675(a)(2).  Determining a dumping margin requires Commerce to

compare the export price or constructed export price with the normal value, which typically is

based on the price at which the foreign like product is sold for consumption in the exporting

country (the "home market").  *Id.* § 1677b(a)(1)(B).  The statute directs in § 1677(16)(A) that

Commerce, in determining the foreign like product, first seek to compare a U.S. sale of subject

merchandise with a home-market sale of merchandise "which is identical in physical

characteristics with, and was produced in the same country by the same person as, that

merchandise."  If no such comparison can be satisfactorily made, Commerce, in accordance with

§ 1677(16)(B), seeks to match the subject merchandise with merchandise produced in the same

country, produced by the same person, that is "like that merchandise in component material or

materials and in the purposes for which used," and "approximately equal in commercial value to

that merchandise."  If the latter comparison cannot be satisfactorily made under § 1677(16)(B),

Commerce is to seek to match the subject merchandise under § 1677(16)(C) with merchandise

produced in the same country and by the same person that is "of the same general class or kind

as the subject merchandise . . . like that merchandise in the purposes for which used, and . . . may

reasonably be compared with that merchandise."

         To determine the sales in the home market that matched the sales of subject merchandise,

a process to which Commerce refers as "model matching," Commerce requested information

from respondents on "Product Characteristics," including, as is relevant here, "Type."  *See Letter*

*from Commerce to Dongbu Steel Co., Ltd.* 34 (Dec. 6, 2007) (Admin. R. Doc. No. 4454).[1] The

questionnaire directed respondents to classify each of their CORE products within one of four

type categories: (1) "Clad (metals bonded by the hot-rolling process), less than 3/16" in

thickness"; (2) "Coated/plated with metal: Painted, or coated with organic silicate,

Polyvinylidene Fluoride ('PVDF')"; (3) "Coated/plated with metal: Painted, or coated with

organic silicate, All Other (*i.e.*, other than PVDF)"; and (4) "Not painted, and not coated with

organic silicate." *Id.* In response, Union proposed reporting its sales of laminated CORE using

an additional type category described as "Coated/plated with metal: Laminated with film."

*Letter from Union to the Sec'y of Commerce* B-5-B-6 (Feb. 4, 2008) (Admin. R. Doc. No. 4530)

("*Union's Feb. 4, 2008 Questionnaire Resp.*").

 In the Final Results, Commerce rejected Union's proposal that laminated CORE

comprise a separate type category for model-matching purposes and accordingly included

laminated CORE within the "other painted" type category. Issues & Decisions Mem.,

A-580-816, ARP 7-07, at 7-8 (Mar. 9, 2009) (Admin. R. Doc. No. 4868) ("*Decision Mem.*"). As

a result, Commerce compared, as merchandise "identical in physical characteristics" for

purposes of § 1677(16)(A), subject merchandise consisting of non-laminated, painted CORE

with not only home-market, non-laminated, painted CORE but also with Union's home-market

sales of laminated CORE products, which Union did not sell in the U.S. market during the POR.

*Union Steel II*, 35 CIT at __, 755 F. Supp. 2d at 1312. Commerce explained its rejecting Union's

---

[1] The administrative record includes the cover letter that the International Trade Administration, U.S. Department of Commerce ("Commerce" or the "Department") sent to each respondent with the initial information requests in this review but includes the full information request only for another respondent in the review, Dongbu Steel Co., Ltd. The court presumes that the information requests were identical.

proposed change to the model-match criteria by stating that Union had "not provided substantial evidence that 1) the model-match criteria are not reflective of the subject merchandise in question, 2) there have been industry-wide changes to the product that merit a modification, or 3) there is some other compelling reason." *Decision Mem.* 7.  Commerce noted that Union had shown certain differences in costs between laminated and non-laminated, painted CORE products, but called these differences "overstat[ed]" and rejected Union's proposed change as "the same methodology that the Department considered in the previous review and found to be without merit." *Id.*[2]

       In response to Union's challenging before the court the Department's decision to reject Union's proposed change to the model-match methodology, Compl. ¶¶ 16-17, defendant requested a voluntary remand.  *Union Steel II*, 35 CIT at __, 755 F. Supp. 2d at 1312-13.  The court's remand order on the model-match issue was "in essentially the form proposed in defendant's draft order, but updated to reflect the significant development" since the voluntary remand request.  *Id.* at __, 755 F. Supp. 2d at 1313.  The development to which the court referred was the court's decision in litigation challenging the final results of the previous (thirteenth) administrative review of the order, in which the court held the Department's model-match methodology "unlawful absent a finding of fact, supported by record evidence, that laminated CORE and painted, nonlaminated CORE are 'identical in physical characteristics' within the meaning of that statutory provision [*i.e.*, 19 U.S.C. § 1677(16)(A)]." *Id.* at __, 755 F. Supp. 2d

---

[2] Commerce also considered and rejected the argument that "laminated products were not considered when the model-match methodology was developed" and the argument that a Commerce memorandum from a previous review indicated that "certain laminated products were outside the scope."  Issues & Decisions Mem., A-580-816, ARP 7-07, at 7 (Mar. 9, 2009) (Admin. R. Doc. No. 4868) ("*Decision Mem.*").

at 1314 (citing *Union Steel v. United States*, 35 CIT __, __, 753 F. Supp. 2d 1317, 1322-23

(2011) ("*Union Steel III*")).  The court's remand order allowed the Department to "reopen the

record to investigate whether only minor and commercially insignificant physical differences

distinguish Union's laminated products from the non-laminated products to which the

Department compared Union's laminated products" and ordered that:

> if substantial record evidence does not support a finding that only minor and
> commercially insignificant physical differences distinguish Union's laminated
> products from the non-laminated products to which the Department compared
> Union's laminated products, the Department must alter the model match
> methodology that was applied in the Final Results so that laminated and
> nonlaminated CORE products are not compared according to 19 U.S.C.
> § 1677(16)(A) . . . .

*Id.* at __, 755 F. Supp. 2d at 1316.

   In the Remand Redetermination, Commerce concluded that reopening the record was not

necessary.  *Remand Redetermination* 5.  Noting that the record contained evidence pertaining to

the cost of manufacture, sales price, production processes, and marketing of both laminated and

non-laminated, painted CORE, the Department stated that "sufficient factual information already

exists on the record for the Department to determine whether the physical differences

distinguishing laminated CORE products and non-laminated, painted CORE products are minor

and not commercially significant."  *Id.*  Upon considering the record evidence, Commerce

determined that the two groups of products were not identical in physical characteristics when

considered under 19 U.S.C. § 1677(16)(A).  *Id.*  Commerce based this determination on four

findings: (1) the two product groups are distinguished by significant physical differences, *id.* at 7

("[L]aminated CORE products by their very nature are not painted products" and "are coated by

attaching a plastic film to a CORE substrate"); (2) "the cost of production for laminated CORE

products is higher than other non-laminated, painted CORE products," *id.*; (3) "the unit price for

laminated CORE products is considerably higher than the unit price of non-laminated, painted

CORE products," *id.* at 8; and (4) laminated and non-laminated products are marketed

differently, the record evidence having demonstrated that "Union and Unico (Union's affiliate)

both differentiate between laminated CORE products and non-laminated, painted CORE

products in their brochures," *id.*

      The Department's determination on remand not to compare laminated and non-laminated,

painted CORE as products "identical in physical characteristics," 19 U.S.C. § 1677(16)(A), rests

on essential factual findings that are supported by substantial record evidence.  Specifically, the

evidence justified the Department's findings that the two groups of products differed physically

(because of the presence of laminate as opposed to paint) and also differed as to cost of

manufacture, sales price, and marketing.  The record evidence, considered on the whole,

supported the finding that the physical differences had commercial significance.

      Substantial evidence supports the Department's finding that the products are physically

different, with a Union questionnaire response indicating that, unlike non-laminated, painted

CORE, laminated CORE has "either a coating of PET ('Polyethylene Telephthalate')[3] film that is

thermally-sealed onto heated, primer-coated CORE substrate after it passes through a drying

oven or a colored PVC ('Polyvinyl Chloride') film attached to the CORE substrate using an

adhesive."  *Union's Feb. 4, 2008 Questionnaire Resp.* B-5-B-6; *see also Letter from Union to

the Sec'y of Commerce* 28 (July 16, 2008) (Admin. R. Doc. No. 4675) ("*Union's July 16, 2008*

---

[3] This document, as well as certain others, refers to "Telephthalate," as opposed to the
more commonly recognized term "terephthalate."

*Questionnaire Resp.*") ("The only substantive difference between laminated products and other

painted CORE products is that a laminated CORE product is one that is coated with a film,

typically either a PET film or a PVC film, instead of being coated with paint.").

     Substantial evidence also supports the Department's findings that "the cost of production

for laminated CORE products is higher than other non-laminated, painted CORE products" and

that "the unit price for laminated CORE products is considerably higher than the unit price of

non-laminated, painted CORE products." *Remand Redetermination* 7-8.  In its February 2008

questionnaire response, Union reported that "[l]aminating the steel increases production costs . . .

and the sales price" by a substantial percentage. *Union's Feb. 4, 2008 Questionnaire Resp*. B-6.

Union also expressed, in a supplemental questionnaire response in July 2008, that "[b]ecause

PET film and PVC are more expensive than the various paints used for other color coated

products, including PVDF, and require more complicated know-how, the production cost and

sales price are higher than other painted products." *Union's July 16, 2008 Questionnaire

Resp.* 30.  These statements are supported by an exhibit to the July 2008 supplemental

questionnaire response showing, first, that the cost to manufacture a unit of laminated CORE

significantly exceeded the cost to manufacture a unit of non-laminated, painted CORE. *Id.*

exhibit B-20.  Second, this exhibit shows that Union's per-unit sale price for laminated CORE

significantly exceeded the per-unit sale price for the "all other" type of painted CORE. *Id.*

     Next, substantial evidence supports the Department's finding that laminated and non-

laminated, painted CORE are marketed differently. *Remand Redetermination* 8.  As part of a

January 2008 questionnaire response, Union submitted a document labeled "Union's and

UNICO's Product Brochures" listing laminated and non-laminated, painted CORE under

different headings on different pages. *Letter from Union to the Sec'y of Commerce* exhibit A-28 (Jan. 22, 2008) (Admin. R. Doc. No. 4504). One page referred to "High-tech Steel" and described three brand names of products that appear to be laminated CORE: (1) "Unipet," which features "[t]hermally laminated PET film"; (2) "Unilux," which is described as "[t]hermally laminated silver-or-aluminum-deposited high-lux reflection film on the surface of electro-galvanized steel"; and (3) "White Board," which is described as "[t]hermally laminated solid white PET film on the steel surface." *Id.* exhibit A-28, at 570.[4] Another page referred to "Pre-painted Steel" and listed several "Available Products," none of which was advertized as laminated or as coated in PET or PVC film. *Id.* exhibit A-28, at 569. Also supporting the finding that these types of CORE are marketed separately is an exhibit to the July 2008 supplemental questionnaire response that includes a brochures for Unipet labeled "PET Film-laminated Steel Sheets" and printouts from the website of Unico referring to CORE products marketed with reference to their laminated quality. *Union's July 16, 2008 Questionnaire Resp.* exhibit B-21.

In summary, Commerce permissibly reached an ultimate determination that laminated CORE products and non-laminated ("other painted") CORE products were distinguished by physical differences that were not minor and were commercially significant. Each of the factual findings that were essential to the Department's decision was supported by substantial record evidence.

---

[4] The brochure describes a fourth brand, "Univure," which the brochure does not identify clearly as either laminated or painted CORE. *Letter from Union to the Sec'y of Commerce* exhibit A-28, at 570 (Jan. 22, 2008) (Admin. R. Doc. No. 4504) (describing Univure as "Layer of patterns printed on the steel surface by removing the laminated printed film with various patterns.").

Defendant-intervenors offer several reasons why they believe the court is required by law to reject the Department's decision on the model-match issue as set forth in the Remand Redetermination.  The court rejects these arguments.

Nucor argues that the Department's decision is arbitrary and not supported by substantial evidence, alleging that "the Department has failed to explain why the record evidence that it previously found unconvincing or inconclusive now provides a sufficient basis to make a model-match change."  Nucor's Comments 2.  In support of this argument, Nucor cites the Issues and Decision Memorandum incorporated into the Final Results ("Decision Memorandum") in asserting that Commerce previously found that "any differences in physical characteristics, production processes, and marketing between laminated and painted CORE are minor."  *Id.* at 3 (citing *Decision Mem.* 7-8).  Nucor also argues that "the Department previously determined that cost and price data on the record supported maintaining the current model-match criteria."  *Id.* at 4.  Further, Nucor argues that the Department's findings in the Remand Redetermination were not consistent with the Department's findings in certain proceedings of the thirteenth administrative review of the order.  Nucor's Comments 3 (citing "an initial remand determination related to the previous administrative review").  U.S. Steel makes a similar argument, maintaining that the Remand Redetermination is inconsistent with the Department's statements in certain proceedings in the thirteenth administrative review ("13AR").  U.S. Steel's Comments 6-10.  U.S. Steel argues, specifically, that the Department's statements were "inconsistent with specific assessments made by Commerce in the 13AR," *id.* at 7, such as statements regarding the significance of physical differences, *id.*, differences in production processes, *id.* at 8, and differences in production costs, *id.* at 9.

These arguments are unpersuasive.  Commerce reached new findings of fact in

determining whether the physical differences between laminated and non-laminated, "other

painted" CORE products were minor and not commercially significant.  It did so to comply with

the court's previous opinion and order, in which the court held that comparing laminated CORE

with painted, non-laminated CORE as identical merchandise is unlawful absent a valid finding of

fact that these two groups of products are "identical in physical characteristics" within the

meaning of 19 U.S.C. § 1677(16)(A).  *Union Steel II*, 35 CIT at __, 755 F. Supp. 2d at 1315-16.

The order directed that Commerce review and reconsider its model-match methodology,

including, specifically, the decision to deny Union's request that the methodology be changed

with respect to the treatment of laminated CORE.  *Id.* at __, 755 F. Supp. 2d at 1315-16.  The

order gave Commerce the option of reaching these factual determinations on the existing record

or reopening the record "to investigate whether only minor and commercially insignificant

physical differences distinguish Union's laminated products from the non-laminated products to

which the Department compared Union's laminated products."  *Id.* at __, 755 F. Supp. 2d

at 1316.  Commerce determined that it did not need to reopen the record to make the factual

determinations necessary for compliance with the court's remand order.  For the reasons the

court discussed previously in this opinion and order, the findings on which Commerce based its

ultimate model-match determination are supported by substantial record evidence and,

accordingly, must be upheld on judicial review.  Any contrary factual determinations that the

Department may have reached in deciding the model-match issue in the Final Results, or in a

previous administrative review are, therefore, of no moment.

Moreover, it appears that the premise of Nucor's argument as to the Final Results is misguided.  Although finding broadly that "the current model match methodology regarding laminated products is reflective of subject merchandise in the instant review," *Decision Mem.* 7, Commerce, in preparing the Final Results, did not set forth clear and specific findings regarding differences in physical characteristics, production processes, marketing, or price between the laminated and the non-laminated, painted CORE products that were the subject of the fourteenth administrative review.[5]  As a general matter, the Decision Memorandum analyzed whether Union had shown that the model-match criteria were not reflective of the subject merchandise in question, whether there had been industry-wide changes to the product that merited a modification, or whether there was some other compelling reason to change the model-match criteria.  In contrast, the Remand Redetermination, as directed by the court, expressly addressed

---

[5] The Issues and Decision Memorandum stated as follows:

Although Union cites to certain cost information based on its questionnaire responses submitted in this review, it is the same methodology that the Department considered in the previous review and found to be without merit. Union's cost information showed a comparatively large cost difference when Union isolated the raw material used solely for lamination, compared with raw material used for some other painted products.  This analysis overstates the differences between laminated and other painted products because it does not account for the numerous aspects of total production cost which are the same for painted and laminated products.

Thus, consistent with the previous reviews of CORE form Korea, the Department finds that the current model match methodology regarding laminated products is reflective of subject merchandise in the instant review. Further, neither changes in industry standards nor other compelling reasons have been presented.  Therefore, we have not changed our model-match methodology in this respect.

*Decision Mem.* 7-8.

the question of whether the physical differences between laminated and non-laminated, painted CORE products were minor and not commercially significant.

Nucor is also incorrect in arguing that the Remand Redetermination is deficient for lack of a satisfactory explanation for the Department's change in position.  As the Remand Redetermination explains, Commerce changed its position upon applying the legal standard that Congress established in 19 U.S.C. § 1677(16)(A), as judicially construed.

Nucor objects, further, that Commerce is reversing its position "based on the data and views of one CORE producer" who "only began challenging the Department's model-match before the Court of International Trade after the 13th administrative review," and that "there is no evidence on the record that the model-match hierarchy proposed by Union is representative of the Korean CORE industry, let alone the CORE industry as a whole."  Nucor's Comments 5. Nucor submits that approval of Union's proposal "has the potential to encourage future manipulation of the model-match criteria by respondents."  *Id.*  The court finds no merit in this wide-ranging objection.  Union unquestionably had the right under section 516A of the Tariff Act, 19 U.S.C. § 1516a, to challenge as contrary to 19 U.S.C. § 1677(16)(A) the Department's model-match methodology as applied to its own products in the fourteenth review.  Upon judicial review, the court was required to adjudicate Union's claim according to the applicable standard of review, under which the court must "hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law . . . ."  19 U.S.C. § 1516a(b)(1)(B)(i).

U.S. Steel argues that Commerce failed to apply the correct legal standard in determining that the physical differences are commercially significant.  U.S. Steel's Comments 4-6.

According to U.S. Steel, the correct legal standard, as sustained by the Court of Appeals in

*Pesquera Mares Australes Ltda. v. United States*, 266 F.3d 1372, 1385 (Fed. Cir. 2001), is an

"industry-wide" standard under which the physical differences must be recognized as

commercially significant by an industry as a whole rather than by only an individual producer.

U.S. Steel's Comments 5.  U.S. Steel argues that Commerce erred in the Remand

Redetermination when it "did not apply the industry-wide standard" and instead "based its

analysis solely on Union's cost of production, prices and product brochures."  *Id.* at 6.  U.S.

Steel argues that "[l]ike the case in *Pesquera*, here there was absolutely no evidence of industry-

wide acceptance of the difference between paints and laminates as a commercially meaningful

difference."  *Id.*  This was legal error, U.S. Steel maintains, because Commerce was obliged to

supply a reasoned analysis upon changing its prior policies and standards.  *Id.*

     U.S. Steel's argument misconstrues the holding in *Pesquera*.  The case does not hold that

Commerce must find a basis in commercially-established, industry-wide product standards

before concluding that *any* two groups of products are not "identical in physical characteristics"

for purposes of 19 U.S.C. § 1677(16)(A).  In *Pesquera*, the Court of Appeals cited approvingly

the Department's relying on industry-wide standards for concluding that there was no

commercially significant difference between "premium" salmon and "super-premium" salmon.

*Pequera*, 266 F.3d at 1385.  The Court of Appeals opined on the advantage of industry-wide

standards in the context of the issue before it, which arose because the two grades of salmon

were shown by record evidence to differ in only minor, commercially insignificant respects, such

as the presence of certain minor aesthetic flaws.  *Id.* at 1383-85.  *Pesquera* upheld the

Department's comparing as identical sales of salmon meeting a quality grade of "super

premium" with sales of salmon meeting only the quality grade of "premium" because Commerce

found, based on substantial record evidence, that most industry participants did not distinguish

between the two grades.  *Id.*  This case presents facts distinctly different from *Pesquera.*  Here,

the two groups of products compared in the Final Results were not shown by substantial record

evidence to be "identical in physical characteristics" within the meaning of the statutory

provision.

      U.S. Steel also contends, inaccurately, that Commerce improperly construed evidence

that laminated and non-laminated, painted CORE go through separate production processes as

establishing that these products had commercially significant physical differences.  U.S. Steel's

Comments 8-9.  Commerce did not base its conclusion of commercial significance solely on the

"the fact that different production processes happen to be used."  *Id.* at 8.  Instead, Commerce

determined that different production processes resulted in the physical differences that, for

various reasons grounded in record evidence, were commercially significant.  *Remand

Redetermination* 9 ("Union's questionnaire responses, and Union's price and cost data,

demonstrate that the physical differences between laminated CORE products and non-laminated,

painted CORE products are neither minor nor commercially insignificant.").

      For the reasons discussed in the foregoing, the court must affirm the decision in the

Remand Redetermination not to compare the subject non-laminated, painted CORE with home-

market laminated CORE as merchandise identical in physical characteristics under 19 U.S.C.

§ 1677(16)(A).  Based on the Department's valid findings and the reasoning set forth in the

Remand Redetermination, the court affirms the Department's decision to classify the laminated

CORE products as a separate type category and thereby exclude Union's home-market sales of this laminated CORE from the respective comparisons.

<u>B.  The Court Reconsiders its Prior Decision Upholding the Use of Zeroing in the Fourteenth Review and Orders an Appropriate Remand</u>

Plaintiff seeks reconsideration of the court's decision in *Union Steel II* affirming the Department's use of the zeroing methodology.  Plaintiff argues that after *Union Steel II* was issued, *Dongbu Steel Co. v. United States*, 635 F.3d 1363, established that the court's decision affirming zeroing was incorrect.  Pl.'s Mot. 1-2.  In *Union Steel II*, the court relied on various decisions of the Court of Appeals, issued prior to *Dongbu*, which had upheld the Department's use of zeroing in administrative reviews despite the Department's having ceased applying the zeroing methodology in original investigations.  *Union Steel II*, 35 CIT at __, 755 F. Supp. 2d at 1315.  Plaintiff argues that the prior decisions of the Court of Appeals are not precedents supporting the use of zeroing in this case, citing language in *Dongbu* in which the Court of Appeals stated that it had "never considered" the precise question of whether Commerce permissibly could interpret the language of 19 U.S.C. § 1677(35) one way with respect to investigations and another way with respect to reviews.  Pl.'s Mot. 3-4; *Dongbu*, 635 F.3d at 1370.

The court first addresses the question of the authority under which it may reconsider its prior order.  The authority under which plaintiff moves, USCIT Rule 59(a)(2), does not apply here.  *See Union Steel v. United States*, 35 CIT __, __, 804 F. Supp. 2d 1356, 1366-67 (2011) ("*Union Steel IV*").  USCIT Rule 59(a)(2) applies "[a]fter a nonjury trial" and allows the court to reconsider prior decisions when a party moves for a new trial or rehearing "not later than 30 days after the entry of the judgment or order."  USCIT R. 59(b).  Although the Court of International

Trade previously has concluded that the concept of a "nonjury trial" encompasses matters, such

as this case, decided on the agency record, *see NSK Corp. v. United States*, 32 CIT 1497, 1502,

593 F. Supp. 2d 1355, 1362 (2008), Rule 59(a)(2) does not authorize the court to hear plaintiff's

motion because that motion, filed on April 5, 2011, came more than thirty days after the court's

February 15, 2011 decision in this case. *See* USCIT R. 6(b)(2) ("The court must not extend the

time to act under . . . 59(b)").  Nothing in the court's rules, however, provides that USCIT

Rule 59 is the only method by which the court may reconsider a prior order. *See Timken Co. v.*

*United States*, 6 CIT 76, 78, 569 F. Supp. 65, 68 (1983); *Union Steel IV*, 35 CIT at __,

804 F. Supp. 2d at 1367.

The alternative authority cited by plaintiff, USCIT Rule 60(b)(6), also is inapplicable to

plaintiff's motion because it applies only to a final judgment, which has not yet been entered in

this case. *See* USCIT Rule 60(b)(6) (stating that "the court may relieve a party . . . from a final

judgment, order or proceeding for . . . any other reason that justifies relief.").  As the advisory

notes to the Federal Rules of Civil Procedure clarify, Rule 60(b) applies only to final decisions.

Fed. R. Civ. P. 60(b), advisory notes ("[I]nterlocutory judgments are not brought within the

restrictions of the rule.").

Instead, the court may reconsider its decision in *Union Steel II* pursuant to its general

authority, which is recognized by USCIT Rule 54, to reconsider a non-final order prior to

entering final judgment.  Rule 54 states that "any order . . . that adjudicates fewer than all the

claims or the rights and liabilities of fewer than all the parties does not end the action . . . and

may be revised at any time before the entry of judgment."  USCIT R. 54(b).  As has been

observed with respect to Fed. R. Civ. P. 60(b), motions for reconsideration not subject to

Rule 60(b) "are left subject to the complete power of the court rendering them to afford such

relief from them as justice requires."  *See* Fed. R. Civ. P. 60(b), advisory notes.  The court

previously relied on this general authority in its decision reconsidering the order upholding the

use of zeroing in the thirteenth administrative review of this order.  *Union Steel IV*, 35 CIT at __,

804 F. Supp. 2d at 1367 (citing *Timken*, 6 CIT at 78, 569 F. Supp. at 68 ("[T]he court retains the

plenary power to modify or alter its prior non-final rulings, particularly where the equitable

powers of the court are invoked.")).[6]

The court concludes that reconsideration of its prior decision affirming the use of zeroing

is warranted.  In two decisions issued in 2011, *JTEKT Corp. v. United States*, 642 F.3d 1378,

1383-85 (Fed. Cir. 2011) and *Dongbu*, the Court of Appeals held that the final results of

administrative reviews in which zeroing was used must be remanded so that Commerce may

explain its interpreting the language of § 1677(35) inconsistently with respect to the use of

zeroing in investigations and the use of zeroing in administrative reviews.  Following the

decisions of the Court of Appeals in *JTEKT Corp.* and *Dongbu*, remands to Commerce for such

an explanation have been ordered in previous cases before this Court.  *See, e.g.*, *SKF USA Inc. v.

United States*, 35 CIT __, __, 800 F. Supp. 2d 1316, 1326 (2011); *SKF USA Inc. v. United States*,

35 CIT __, __, Slip Op. 11-94, at 10-13 (Aug. 2, 2011); *JTEKT Corp. v. United States*, 35 CIT

__, __, 780 F. Supp. 2d 1357, 1363-64 (2011).

---

[6] Although this Court in a prior case "declin[ed] to find the authority to rehear
interlocutory orders under USCIT Rule 54(b)," it did so when reconsideration under USCIT
Rule 59(a)(2) remained available, and thus that case did not involve the issue before the court in
this case, in which the time for a motion under USCIT Rule 59 has lapsed.  *NSK Corp. v. United
States*, 32 CIT 1497, 1502 n.7, 593 F. Supp. 2d 1355, 1362 n.7 (2008).

    The court does not have before it a statutory construction by the Department that is

satisfactory under the reasoning of *Dongbu* and *JTEKT Corp.*  Therefore, the court will set aside

its previous affirmance of the use of zeroing in *Union Steel II* and will direct Commerce to

provide the explanation contemplated by the Court of Appeals in *Dongbu* and *JTEKT Corp.*,

each of which questioned the Department's construction of § 1677(35) and declined to affirm the

judgment of the Court of International Trade upholding the use of zeroing in an administrative

review of an antidumping duty order.  *See Dongbu*, 635 F.3d at 1371-73; *JTEKT Corp.*, 642 F.3d

at 1383-85.  The Decision Memorandum attempts to explain the inconsistent interpretation of

§ 1677(35) using a rationale essentially the same as the one the Court of Appeals rejected in

*JTEKT Corp.  Decision Mem.* 10-11.  After providing a list of distictions between investigations

and administrative reviews, the Decision Memorandum summarily concludes that "[b]ecause of

these distinctions," the Department's inconsistent interpretation of § 1677(35) was not

"improper."  *Id.*[7]  Missing is reasoning adequate to link the identified distinctions to the

---

[7] The entire discussion on the statutory construction issue reads as follows:

The Federal Circuit (Federal Circuit) has found the language and congressional
intent behind section 771(35) of the Act to be ambiguous.  Furthermore, antidumping
investigations and administrative reviews are different proceedings with different
purposes.  Specifically, in antidumping investigations, the Act specifies particular
types of comparisons that may be used to calculate dumping margins and the
conditions under which those types of comparisons may be used.  The Act discusses
the types of comparisons used in administrative reviews. [The] Department's
regulations further clarify the types of comparisons that will be used in each type of
proceeding.  In antidumping investigations, the Department generally uses
average-to-average comparisons, whereas in administrative reviews the Department
generally uses average-to-transaction comparisons.  The purpose of the dumping
margin calculation also varies significantly between antidumping investigations and
reviews. In antidumping investigations, the primary function of the dumping margin
is to determine whether an antidumping duty order will be imposed on the subject

                                                                              (continued...)

Department's varying constructions of the words of the statute in the two contexts. The Court of

Appeals concluded in *JTEKT Corp.* that providing this list of distinctions "failed to address the

relevant question—why is it a reasonable interpretation of the statute to zero in administrative

reviews, but not in investigations?" *JTEKT Corp.*, 642 F.3d at 1384.[8]

The arguments other parties to this case advance in opposition to reconsideration are not

persuasive. Defendant argues that *Dongbu* does not justify reconsideration because *Dongbu* was

limited to its unique procedural setting, in which Commerce lacked opportunity to respond to the

plaintiff's statutory interpretation argument. Def.'s Opp'n 4-5. The court does not read the

opinion in *Dongbu* so narrowly as to consider the reasoning of *Dongbu* inapplicable here. To do

so would miss the more general point that in *Dongbu*, as well as in *JTEKT Corp.*, the Court of

Appeals refused to affirm a judgment of the Court of International Trade upholding the use of

zeroing in an administrative review. Moreover, *JTEKT Corp.* vacated a judgment upholding the

---

[7](...continued)
imports. In administrative reviews, in contrast, the dumping margin is the basis for
the assessment of antidumping duties on entries of merchandise subject to the
antidumping duty order. Because of these distinctions, the Department's limiting of
the Final Modification to antidumping investigations involving average-to-average
comparisons does not render its interpretation of section 771(35) of the Act in
administrative reviews improper. Therefore, because section 771(35) of the Act is
ambiguous, the Department may interpret that provision differently in the context of
antidumping investigations involving average-to-average comparisons than in the
context of administrative reviews.

*Decision Mem.* 10-11.

[8] In litigation arising from the sixteenth administrative review of the order at issue in this
case, the Court of International Trade upheld an explanation by Commerce addressing the
statutory construction issue identified in *Dongbu Steel Co. v. United States*, 635 F.3d 1363 (Fed.
Cir. 2011) and *JTEKT Corp. v. United States*, 642 F.3d 1378 (Fed. Cir. 2011). *Union Steel v.
United States*, 36 CIT __, Slip Op. 12-24 (Feb. 27, 2012). Neither that explanation nor one
similar to it is before the court in this proceeding.

Department's use of zeroing when the Department not only had an opportunity to explain such use but did so using essentially the same rationale offered here.

U.S. Steel argues that the court should not reconsider its decision upholding zeroing because *Dongbu* did not hold the Department's inconsistent interpretations of § 1677(35) to be unlawful but merely held these interpretations to be insufficiently explained and, therefore, did not change the controlling law.  U.S. Steel's Opp'n 5-6.  Although U.S. Steel is correct that the Court of Appeals has not held the Department's interpretations unlawful, it does not follow that reconsideration is inappropriate.  *JTEKT Corp.* and *Dongbu* signify that the Department's interpretation of § 1677(35) is unsustainable absent an explanation different from the one the Department put forth in the fourteenth review.  *See JTEKT Corp.*, 642 F.3d at 1383-85; *Dongbu*, 635 F.3d at 1371-73.

Nucor's objections are similarly unpersuasive.  Nucor cites the fact that Union's motion for reconsideration was filed more than thirty days after the court's decision in *Union Steel II*, thus making reconsideration under USCIT Rule 59(a) unavailable, and also cites the inapplicability of USCIT Rule 60(b) to the non-final order issued in *Union Steel II*.  Nucor's Opp'n 2-4.  Nucor's arguments err in failing to recognize the court's general authority to reconsider non-final orders.

In summary, remand in this case is appropriate so that Commerce may alter its decision to apply zeroing with respect to Union in the fourteenth review or, alternatively, provide an explanation as contemplated in *JTEKT Corp*. and *Dongbu*, *i.e.*, an explanation of how the language of 19 U.S.C. § 1677(35) as applied to the use of zeroing permissibly may be construed

in one way with respect to investigations and the opposite way with respect to administrative

reviews.

### III.  CONCLUSION AND ORDER

Upon consideration of all proceedings and submissions herein, and upon due deliberation, it is hereby

**ORDERED** that the *Final Results of Redetermination Pursuant to Remand* (July 15, 2011), ECF No. 115 ("Remand Redetermination") be, and hereby are, AFFIRMED with respect to the decision stated therein to modify the model-match methodology of the International Trade Administration, U.S. Department of Commerce ("Commerce" or the "Department"); it is further

**ORDERED** that Defendant's Motion for Leave to File Response to Plaintiff's Notice of Supplemental Authority, as filed on March 6, 2012, be, and hereby is, GRANTED, and that Defendant's Response to Plaintiff's Notice of Supplemental Authority be, and hereby is, accepted as filed on March 6, 2012; it is further

**ORDERED** that plaintiff's Motion for Reconsideration, filed on April 5, 2011, be, and hereby is, GRANTED; it is further

**ORDERED** that the court's previous affirmance of the Department's decision in *Certain Corrosion-Resistant Carbon Steel Flat Products from the Republic of Korea: Notice of Final Results of the Fourteenth Admin. Review & Partial Rescission*, 74 Fed. Reg. 11,082 (Mar. 16, 2009) ("Final Results") to apply the zeroing methodology be, and hereby is, set aside; it is further

**ORDERED** that, on remand, Commerce must reconsider its decision in the Final Results to apply the zeroing methodology and must either alter that decision or explain how the language of 19 U.S.C. § 1677(35) permissibly may be construed in one way with respect to the use of the zeroing methodology in antidumping investigations and the opposite way with respect to the use of that methodology in antidumping administrative reviews, and shall recalculate any antidumping duty margin applied to plaintiff that is affected by an alteration of that decision; it is further

**ORDERED** that Commerce shall file the second remand redetermination with the court not later than sixty (60) days from the date of this Opinion and Order, and that plaintiff and defendant-intervenors shall have thirty (30) days from the date on which Commerce files the second remand redetermination to file any comments thereon; and it is further

**Court No. 09-00130**                                                                           **Page 28**

     **ORDERED** that defendant shall be allowed fifteen (15) days from the last filing of any comments by plaintiff or defendant-intervenors in which to file a rebuttal or other response to the comments of plaintiff or defendant-intervenors.


        /s/ Timothy C. Stanceu

       Timothy C. Stanceu

       Judge


Dated: April 25, 2012
      New York, New York